*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

NANCY DELAND,

Plaintiff-Appellee,

v

GREGORY DELAND,

Defendant-Appellant.

UNPUBLISHED
June 30, 2022

No. 356680
Oakland Circuit Court
Family Division
LC No. 2019-873088-DM

Before: JANSEN, P.J., and CAVANAGH and RIORDAN, JJ.

PER CURIAM.

Defendant appeals as of right a judgment of divorce in this action between plaintiff, Nancy DeLand, and defendant, Gregory DeLand. Defendant's issues on appeal relate to the trial court's valuation and division of marital property, particularly defendant's business, and also the trial court's treatment of a $65,000 loan defendant gave to his company. We affirm the trial court's valuation and treatment of defendant's business but vacate the court's resolution of the $65,000 loan and remand to that court for further proceedings.

## I. STANDARD OF REVIEW

In a divorce case, this Court reviews the trial court's factual findings for clear error. *Sparks v Sparks*, 440 Mich 141, 151; 485 NW2d 893 (1992). "A finding is clearly erroneous if the appellate court, on all the evidence, is left with a definite and firm conviction that a mistake has been committed." *Beason v Beason*, 435 Mich 791, 805; 460 NW2d 207 (1990). A reviewing court is to then decide if, in light of those facts, the trial court's division of property was fair and equitable. *Sparks*, 440 Mich at 151-152. That dispositional ruling is to be affirmed unless this Court is left with a firm conviction that the property division was inequitable. *Id*. at 152.

## II. VALUATION OF DEFENDANT'S BUSINESS

-1-

Defendant argues that the trial court clearly erred when it assigned a value of $425,000 to the operational value of his business. We disagree.

When considering how to divide property in a divorce proceeding, a trial court's initial step is to determine the parties' marital and separate estates. *Reeves v Reeves*, 226 Mich App 490, 493-494; 575 NW2d 1 (1997). In general, each party is to keep his or her separate property, while the marital estate is subject to division among the parties. *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). "[M]arital property is that which is acquired or earned during the marriage, whereas separate property is that which is obtained or earned before the marriage." *Id.*

Defendant does not dispute that his business, CMA Accounting and Consulting ("CMA"), was created during the parties' marriage and is a marital asset subject to division. Defendant's argument is focused on the value the trial court assigned to this asset. The trial court adopted the valuation of plaintiff's expert, Jason LeRoy, who valued the operational portion of CMA at $425,000.

Defendant appears to take issue with LeRoy having utilized the discounted cashflow method for his analysis. But defendant's own expert utilized this same method. Accordingly, we fail to see how relying on this method constitutes clear error. Defendant also makes a more nuanced argument that LeRoy impermissibly used a holder's interest approach. From the record, it is not clear how a holder's interest approach differs from the generic discounted cashflow method; neither expert provided any insight on this. The only evidence alluding to this was the testimony of defendant's expert, Justin Cherfoli:

> *Q.* And you indicate early in your testimony, you use the discounted cashflow method, and you used a holder[']s interest for a company that operates like this, correct?

> *A.* First part of your question, yes. I use discounted cashflow method. Second part of your question, I didn't opine on holder[']s interest.

Thus, it seems that the holder's interest approach may be a distinct type of the discounted cashflow method, but no one explained what that distinction was and how, if LeRoy had not used a holder's interest, his valuation would have been affected. Further, despite Cherfoli's assertions that he never "opine[d]" on a holder's interest, both experts suggested that the primary difference between their respective analyses was their projections of CMA's gross profits.

In any event, the trial court did not clearly err by relying on a valuation that utilized the holder's interest approach. As explained in Cunningham, *Equitable Distribution and Professional Practices: Case Specific Approach to Valuation*, 73 Mich B J 666, 667 (1994):

> Applying the holder's interest measure of value to a personal service business such as a professional practice is simply an extension of the principles of case specific valuation commonly used by trial courts in dividing marital assets under equitable distribution principles. Stripped to its core, the holder's interest value means that:

(1) If an interest in a personal service business is worth considerably more to the owner (a) under the assumption that he or she will continue to operate the business—and accordingly, continue to reap the financial benefits it provides, than (b) assuming the owner will sell the business to a third party . . .

(2) then the appropriate value for divorce settlement purposes, that is, for determining the offsetting amount of cash or value of other property for the nonowners spouse, is the value to the owner, not the lower [fair market value].

This is not a radical departure from the case specific methods of valuation for divorce settlement purposes that have evolved and become generally accepted . . . . Rather, adoption of the holder's interest measure of value simply brings into conformity the valuation of personal service businesses with the way most other marital assets have been valued for years.

In *Kowalesky v Kowalesky*, 148 Mich App 151; 384 NW2d 112 (1986), similar to the present case, the issue before this Court was the proper valuation of a business. We stated that if the plaintiff was going to continue his business, then "the valuation of the practice should be the value of the practice to plaintiff as a going concern." *Id*. at 157. This seems synonymous with the holder's interest method described above.

Defendant argues that the holder's interest approach should not be utilized because he "unequivocally requested to sell the business." However, the evidence does not support defendant's contention. First, defendant's expert stated that for his analysis he assumed CMA would be an ongoing operation.[1] Second, the trial court specifically found that defendant "was evasive and untruthful throughout these proceedings" in relation to his repayment of the $65,000 loan "*and other matters*." (Emphasis added.) Thus, the trial court clearly discounted much of defendant's testimony. This Court will not interfere with the trial court's credibility determinations. *Berger v Berger*, 277 Mich App 700, 707; 747 NW2d 336 (2008). Third, however, defendant's testimony was anything but unequivocal on his intent with his business. There is evidence in the record that a third party issued a letter of intent to purchase CMA's two primary income streams for $200,000, and defendant stated that he would be "willing" to accept the offer, opining that "there's good advantages to [accepting]." Later, defendant stated that CMA "most likely" would be terminated, but also acknowledged that despite this supposed looming situation, he had not searched for any potential employment. More significantly, when directly asked if he had "every intent" on continuing to operate CMA, defendant replied, "That depends on what the ruling comes out here with the judgment of this divorce, but if it's sold, if CMA, the assets are sold, then I wouldn't plan on running that." Defendant's conditional response strongly suggests that as long as the trial court did not order CMA sold, then he would continue to operate

---

[1] Cherfoli stated that he used $120,000 as a gross profit "on an ongoing basis" and that he set defendant's "ongoing compensation" at $100,000 a year.

it.  Therefore, because the trial court did not order the liquidation or sale of CMA, it did not clearly err by adopting a valuation that utilized the holder's interest approach.[2]

The trial court also did not clearly err by relying on LeRoy's valuation instead of Cherfoli's. The trial court stated that it discounted Cherfoli's valuation because it was based on projections provided to him by defendant—projections that later were proven to be wholly inaccurate, with even defendant conceding that they were inaccurate.  The trial court's position on this issue is reasonable.  The projected annual gross profits for 2020-2023, along with the actual amounts of gross profit for the first nine months of 2020,[3] are as follows:

| Year | Actual Gross Profit (If Known) | LeRoy's Gross Profit Projection | Cherfoli's Gross Profit Projection |
|---|---|---|---|
| 2020 | $161,469* | $188,217 | $146,303 |
| 2021 | n/a | $206,551 | $92,750 |
| 2022 | n/a | $206,551 | $120,000 |
| 2023 | n/a | $206,551 | $120,000 |

* this gross profit was only for the first nine months of 2020.

Because the analyses largely depended on these projections, it was reasonable for the trial court to use the analysis that had the most accurate projections.  Unremarkably, the accuracies of projections into the future are not known at the time they are made.  But because of the timing of when these analyses were created and when trial finally occurred, it is possible to evaluate some of the projections.  Specifically, for 2020, the actual amount of CMA's gross profits exceeded $161,000 through September.  Notably, this partial-year amount exceeds Cherfoli's projection for the entire 2020 calendar year.  If that amount for the first nine months of 2020 is extrapolated for the remainder of the year, the result is $215,592 in gross profits for 2020.  In comparison, Cherfoli's projected 2020 gross profit was $146,303, and LeRoy used a projected 2020 gross profit of $188,217.  Clearly, LeRoy's projection for 2020, although likely understated, was more accurate, and defendant acknowledged at trial that the projection he created was not accurate. Moreover, 2020's extrapolated gross profit of $215,592, although lower, is still similar to how CMA had performed historically.  The average yearly gross profit for CMA from 2015-2019 (excluding 2018)[4] was $224,078.  Thus, with the impact of the COVID pandemic, it was not surprising to see CMA perform lower than it had historically, but the data shows that it was not going to be as bad as defendant's projection.  Indeed, at trial, defendant explained the results as

---

[2] Defendant also argues that the trial court failed to specifically find that he had intended to continue to operate CMA.  But with his concession that he would only cease to operate CMA if the trial court ordered that it was to be sold, there was no real need to explicitly make this finding, in light of the court not ordering CMA's sale.

[3] Because trial concluded in October 2020, only the data for the first nine months of 2020 were available at the time.

[4] There was no disagreement that 2018 was an exceptional year for CMA, so to make sure that year did not have undue influence, LeRoy regularly provided and looked at data that omitted 2018.

reflecting some of his clients' businesses doing poorly during the COVID pandemic while others prospered.

Defendant also argues that another reason why the trial court erred in selecting LeRoy's valuation is that LeRoy used an incorrect or artificially low discount risk rate in his calculations. He used a 5% risk rate, and Cherfoli used the same 5% risk premium. Defendant argues that although both experts used the same numerical percentage, LeRoy's rate was too low in context with the higher revenues and profits he was projecting. However, LeRoy testified that his rate reflected, collectively, "all of the risks" posed to CMA. Moreover, the portion of Cherfoli's testimony that defendant relies on to support his argument is not sufficient to give rise to an inference that LeRoy's use of a 5% risk assessment is clearly erroneous. Cherfoli stated:

> [W]hile it's the same number, I don't know that if you put Mr. LeRoy [in] a room, we'd agree that it applies to the same level of cash flows because the higher you project the cash flows, the more risk that you recognize so you know, under that scenario, I'm not sure that we're talking apples to apples, but for purposes of the report they are the same number.

Importantly, nowhere did Cherfoli state what risk percentage would have been appropriate to use with LeRoy's projections. Just as importantly, Cherfoli conceded that he did not know if LeRoy would agree with his suggestion that the risk percentage should be higher based solely on the higher levels of the projections. But with LeRoy previously stating that his 5% risk premium accounted for "all of the risks" posed to CMA, it is clear that LeRoy would in fact not agree with Cherfoli's assessment. Accordingly, with both experts using the same 5% discount rate for risk and with nothing substantive to explain why it was not acceptable for LeRoy to have used it, the trial court did not clearly err by relying on LeRoy's valuation.

In sum, both experts valued CMA as a going concern, defendant acknowledged that he only would not operate CMA if the trial court ordered that it be sold, and LeRoy's projections, which formed the basis for his valuation, were objectively more reliable and accurate than the projections Cherfoli used in his valuation. Therefore, we are not left with a definite and firm conviction that the trial court made a mistake when it adopted LeRoy's valuation.

### III. $65,000 LOAN

Defendant argues that the trial court erred by awarding plaintiff $32,500 (half of the $65,000 loan amount) from his half of the marital estate. We agree, in part.

On May 9, 2019, plaintiff notified defendant that she was actively working on filing for divorce. On May 13, 2019, defendant withdrew $65,000 from the parties' joint Flagstar Bank account and placed the money in one of his business accounts, to which only he had access. After the withdrawal, the Flagstar account was left with a balance of approximately $3,000. Defendant admitted that he withdrew the money without plaintiff's knowledge or consent and that he knew at the time of the withdrawal that plaintiff was planning on filing for divorce. Defendant asserted that the $65,000 was a loan to CMA which was supported by a shareholder loan agreement defendant executed. Defendant's business accounts had between $300,000 and $350,000 at the time of the withdrawal. Plaintiff maintained that if it was a loan, it was never paid back. Although

defendant repeatedly stated in his deposition that he did not know where the $65,000 was and did not know whether it had been repaid, he asserted at trial that the $65,000 had indeed been paid back. He explained that the money was not paid back in a lump sum, but instead in "partial payments." Defendant also says that while the money was never deposited back into any joint account, the funds nonetheless were used to pay part of the parties' legal fees. But defendant then tried to "correct" his statement because he was "not sure which accounts the money got deposited back into, but it could have been deposited into personal accounts." Later still, defendant stated that, while paying these legal bills, the funds went "in and out [of personal accounts] on the same day." In other words, defendant's position was that the $65,000 he withdrew from the joint bank account was repaid in the form of paying off the parties' legal bills.

In addressing the $65,000 that defendant withdrew from the parties' joint bank account, the trial court stated:

> Based on the evidence presented at trial, the Court finds that Defendant removed $65,000 from the joint Flagstar bank account on May 13, 2019, without Plaintiff's knowledge or consent, after learning that Plaintiff was filing for divorce. Defendant loaned the money to himself in the name of CMA and used at least some of the money to pay his attorney fees. The Court finds that Defendant was evasive and untruthful throughout these proceedings regarding the repayment of the loan and other matters. Defendant never deposited the funds back into the joint bank account. Because the $65,000 were marital funds, the Court awards Plaintiff $32,500, as one-half the amount of the funds removed from the marital account, to be paid by Defendant from his half of the proceeds from the sale of the marital home, as set forth below.

Defendant makes the argument that making him repay plaintiff's portion of the loan from his half of the marital estate is inequitable because with plaintiff receiving half of CMA's account, she would separately be receiving her half of the $65,000.[5] As defendant observes, with the trial court finding that none of the $65,000 had been deposited back into the parties' joint account, the implication is that it *remained* in CMA's account. Thus, defendant contends, when plaintiff was awarded half of CMA's account, she essentially was being given half of the $65,000 already. Based on this reasoning, the defendant concludes that the trial court ultimately awarded plaintiff a double recovery.[6]

In contrast, the trial court found, reasonably so, that defendant was "evasive and untruthful" regarding the $65,000. Based on this, plaintiff argues that it is not inequitable to award her a share of the $65,000 when defendant's evasiveness and untruthfulness created uncertainty as to where the money actually went. As the Court previously has found, "[a] party's attempt to conceal assets

---

[5] Plaintiff was awarded half of the value, as of July 31, 2020, of CMA's account, and it is this account where the $65,000 was deposited.

[6] Because a trial court generally must award each party half of the marital estate, one party cannot receive a "double recovery" from the other party. See *Grace v Grace*, 253 Mich App 357, 368; 655 NW2d 595 (2002).

is a relevant consideration" when dividing the marital estate. *Sands v Sands*, 442 Mich 30, 36; 497 NW2d 493 (1993). Thus, the trial court had the ability to sanction defendant for his evasiveness and untruthfulness by awarding plaintiff a share of the $65,000 in addition to her half of CMA's account. In other words, because defendant did not clearly or truthfully explain the whereabouts of the $65,000, the trial court was permitted to infer that defendant retained or spent the money himself, which would equitably entitle plaintiff to a share of that money.

However, the trial court did not expressly state that it intended to sanction defendant or otherwise equitably award plaintiff what might be a double recovery through the $32,500. Indeed, we note that the trial court elsewhere ordered that plaintiff's attorney fees be paid out of the marital assets, which might have been its intended sanction for defendant's evasiveness and untruthfulness. Because the record is unclear whether the award of $32,500 to plaintiff was intended to be a sanction against defendant, we vacate the trial court's award in this regard and remand to that court for further proceedings. On remand, the trial court may clarify that the award of $32,500 was intended to be a sanction and reaffirm that award, or else adjust or eliminate that award for an equitable division of the marital estate. See *Sparks*, 440 Mich at 151-152.

## IV. VALUATION DATE

Defendant argues that the trial court erred when it valued defendant's business as of July 31, 2020. We disagree.

"Where the court determines that a particular asset is, in fact, a marital asset, it must then value the asset as of either the date of trial, the date of judgment, or a more appropriate date." *Byington v Byington*, 224 Mich App 103, 114 n 4; 568 NW2d 141 (1997). This Court explained:

> As a practical matter, this process creates conflicting motivations as between the parties to a divorce regarding its finalization. An early valuation date encourages parties to postpone potentially economically beneficial contractual relationships to avoid having to share such accessions of wealth with a spouse. A later valuation date encourages those who think the other spouse is in line for such a financial asset to delay the proceedings in hopes of securing for themselves a portion of such asset. A related public policy complication is that if a valuation date is regarded as fixed, a party with an expectancy of entering into a potentially economically beneficial contractual relationship would be provided with an incentive not to attempt to reconcile. Hence, in determining the valuation date, the circuit court must and does retain consideration discretion to see that equity is done, *Boonstra v Boonstra*, 209 Mich App 558, 563; 531 NW2d 777 (1995), thereby limiting to whatever extent feasible any artificial impetus to file for, delay, hasten, or finalize a divorce. Further, an important goal of the process by which marital assets are divided properly ought to be to limit the extent to which the process skews ordinary financial arrangements and incentives. [*Id*.]

Consequently, this Court suggested that circuit courts should schedule firm valuation dates shortly after the filing of a divorce complaint and hold to that valuation date even if the trial date is postponed. *Id*.

Defendant's main argument on this issue is that the July 31, 2020 valuation considered that CMA had $270,000 in its bank accounts, but at the time of the judgment of divorce, it only had $230,000. Thus, with defendant being ordered to pay plaintiff approximately $220,000 from the business accounts, CMA was left with only $10,000. This was in sharp contrast with the $50,000 LeRoy contemplated would be left in CMA's accounts. LeRoy testified that he created this plan with the assumption that CMA needed between $30,000 and $50,000 in working capital to operate.

When this precise issue was brought to the trial court's attention, it disagreed with defendant's position, stressing that the valuation date "can't be a moving target." The trial court continued:

> There has to be a moment in time that I freeze things and divide. Otherwise, it's ever-changing values, and if I have folks who are willing to harm themselves financially in order to harm someone else financially as well, cut off their nose to spite their face, then it gets driven down into worthlessness or significantly less value than it could have been had different decisions been made.

> * * *

> Mr. Deland holds all the cards in terms of the business account and how he wants to move money around, what he wants to pay, whether he wants to deposit it and then immediately withdraw it, moving things back and forth. For all I know, that's how [the court-appointed receiver] got paid, I don't know, out of that.

> There has to be a moment in time when it freezes, and I do the best that I can to assess the marital estate and divide it fairly. . . . So that number [the $220,000 lump sum payment], respectfully, should stand.

We are not left with a firm conviction that the trial court made an inequitable decision. The selection of a valuation date is subjective and open to many possibilities. See *Byington*, 224 Mich App at 114 n 4. The trial court reasonably used LeRoy's valuation, which had the July 31, 2020 valuation date. Much of defendant's complaints are that he paid for "marital debt" out of the company's accounts *after* this date, which means that plaintiff not only received half of the July 31, 2020 balance, but also received the benefit of marital debt being paid from the now-depleted CMA accounts. One of the problems with defendant's argument is that there was no evidence regarding how much money he spent on his attorney fees during the month of August 2020. At trial, he thought he owed his attorney money "as of August," but did not know how much. Thus, there is no evidence to support defendant's assertion that he paid attorney fees incurred after July 31, 2020, but before August 31, 2020. Defendant also fails to recognize that, although the trial court ruled that plaintiff's attorney and expert fees through August 31, 2020, were to be paid from marital funds, that was only in response to defendant unilaterally using CMA's funds (i.e., marital funds), of which plaintiff had no access, for his own fees. Otherwise, it is clear that the trial court

would have treated the parties' legal fees as separate debt.[7]  In other words, it was defendant's actions that drove the trial court to formulate a remedy for *his* inequitable treatment of attorney fees with the CMA marital funds.  With that understanding, we are not left with a firm conviction that the trial court selected an inequitable outcome.

Defendant also points out other circumstances that purportedly make the trial court's valuation date inequitable.  He claims that he paid his share of the receiver's fee from his own accounts, but no evidence supported this claim, and the trial court openly questioned it.  Defendant also takes issue with how the trial court handled the parties' tax returns.  The parties stipulated to the entry of an order that, among other things, required them to file a joint return for 2020 and share equally in any refund.  It is not clear how this is pertinent.  From the trial court's opinion issued on February 10, 2021, defendant was fully aware of how the court desired to handle the valuation and plaintiff's payout with regard to CMA.  Yet, despite knowing this, defendant agreed to equally split any refunds from the 2020 return.  To the extent that defendant now objects to the terms of the March 10, 2021 order regarding the tax returns, he waived any claim of error by stipulating to them.  See *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000).

Lastly, defendant suggests that the plan for him to pay plaintiff in monthly installments of $3,698 through 2023 is erroneous.  He claims that this procedure is akin to spousal support, but because it is tied to property division, it lacks the safeguards of being able to be modified if CMA happens to fail in the future.  Defendant does not clearly articulate how the merits of the installment plan are relevant to the actual issue on appeal.  We opine that defendant is arguing that relying on LeRoy's projection is illogical because if CMA fails, then it shows that his valuation, which projected a yearly future profit of $206,551 after 2022, ultimately was incorrect.  Defendant contends that it would be inequitable to then have him continue to pay this predetermined amount to plaintiff if the underlying valuation was proven to be demonstrably false.  But, this is no different than *any* valuation of any other company in a divorce proceeding.  Any time after its valuation, a company could go bankrupt, cease to exist, or otherwise lose value.  Conversely, its value could dramatically increase to the benefit of the owner-party.

The "problem" that defendant has identified is that the trial court allowed defendant to pay plaintiff in installments instead of requiring him to pay plaintiff her entire 50% share of the company in one lump sum.  But the same situation would be present if the trial court imposed a one-time lump-sum payment.  For instance, if defendant had been required to pay plaintiff $348,000, based on LeRoy's $696,000 total valuation for CMA,[8] the same complaints could have been raised if CMA went bankrupt in the future, i.e., that the $348,000 payment was inequitable

---

[7] This is the only logical inference from the trial court's opinion.  The trial court stated that it would treat plaintiff's fees incurred by August 31, 2020, as marital debt because of defendant's actions, but for attorney fees incurred after that date, the debt would be the responsibility of the party who incurred it.  Thus, it seems clear that the trial court would have treated the debt individually if defendant had not taken it upon himself to pay his debt from marital funds that only he had access to.

[8] This $696,000 total valuation was derived from LeRoy's $425,000 operational valuation of CMA plus the $270,825 CMA had in its bank account as of July 31, 2020.

because the $696,000 valuation was proven false. This is the nature of projections. No one can guarantee their accuracy into the future. Regardless of this uncertainty, courts are required to assign a value to marital property, *Byington*, 224 Mich App at 114 n 4, and the trial court made a reasonable decision to adopt LeRoy's valuation. The decision was even easier given that the competing expert valuation of $45,000, not including CMA's cash accounts, was dubious on its face given the company had a strong history of producing in excess of $200,000 in gross profits every year. As the trial court noted, defendant "put his expert in a horrific situation" by providing self-serving, inaccurate projections.

Therefore, the trial court's use of July 31, 2020, as the valuation date for CMA was not illogical or inequitable.

## V. CONCLUSION

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this opinion. In the interest of expediency and efficiency, we retain jurisdiction.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan

# Court of Appeals, State of Michigan

# ORDER

Nancy Deland v Gregory Deland

Docket No.   356680

LC No.      2019-873088-DM

Kathleen Jansen
Presiding Judge

Mark J. Cavanagh

Michael J. Riordan
Judges

Pursuant to the opinion issued concurrently with this order, this case is REMANDED for further proceedings consistent with the opinion of this Court. We retain jurisdiction.

Proceedings on remand in this matter shall commence within 28 days of the Clerk's certification of this order, and they shall be given priority on remand until they are concluded. As stated in the accompanying opinion, this matter is REMANDED to the trial court to make further findings in conformance with the accompanying opinion, as to its findings of awarding the plaintiff $32,500. Said findings shall be filed with this Court within 54 days of completion. The trial court, at its discretion, may require further testimony and/or briefing from the parties. The proceedings on remand are limited to this issue.

The transcript of all proceedings on remand shall be prepared and filed within 21 days after completion of the proceedings.

_____
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

June 30, 2022
Date

_____
Chief Clerk